### THE NEW YORK CENTRAL NO. 18.

### THE OVERBROOK.

(District Court, E. D. New York.  January 7, 1916.)

1. COLLISION ⊙⟿63—TUGS WITH TOWS—COMMON FAULTS.

    Two tugs, one crossing with tows from Jersey City to the New York side of the Hudson, and the other making up her tow of two car floats, which she had just brought from a slip on the New York side, with a strong ebb tide, both *held* in fault for a collision between the tows.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 79; Dec. Dig. ⊙⟿63.]

2. COLLISION ⊙⟿37—RULES FOR PREVENTING—STARBOARD HAND RULE.

    The starboard hand rule applies to a boat approaching on a crossing course, so as to pass other boats in motion and affected by the tide, even though they do not seem to be navigating in a definite direction.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 34–36; Dec. Dig. ⊙⟿37.]

3. COLLISION ⊙⟿67—MOVING AND STATIONARY VESSELS—ALLOWANCE FOR EFFECT OF TIDE.

    If a tow, being approached by another boat, is looked upon as stationary. the approaching boat must keep off, so as to give sufficient clearance, in view of the drift of the tide.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 85, 86; Dec. Dig. ⊙⟿67.]

4. COLLISION ☞68—MOVING AND DRIFTING VESSELS—VOLUNTARY MOVEMENT OF DRIFTING BOAT.

A drifting boat, with power available, is responsible for any effect of her movements undertaken while drifting, unless a signal therefor be given in time.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 85½; Dec. Dig. ☞68.]

In Admiralty. Suit for collision by Peter Aldrich, owner of the canal boat Mamie Aldrich, against the steam tug New York Central No. 18, with the tug Overbrook impleaded. Decree against both tugs.

Nelson Zabriskie, of New York City, for libelant.

Harrington, Bigham & Englar, of New York City (T. C. Jones, of New York City, of counsel), for claimant of the New York Central No. 18.

Burlingham, Montgomery & Beecher, of New York City (Chauncey I. Clark, of New York City, of counsel), for claimant of the Overbrook.

CHATFIELD, District Judge. On December 12, 1914, the canal boat Mamie Aldrich, with a cargo of coal, was in tow of the tug boat Overbrook, on a trip from Jersey City to Gansevoort street on the New York side of the Hudson river. The Overbrook had one boat lashed to her port side, and two boats on the starboard; the Mamie Aldrich being the outside boat. When just below Franklin street (Pier 24, North River), at about 10:15 a. m., with a strong ebb tide, a collision occurred on the starboard side of the Mamie Aldrich, which came in contact with the port corner of the car float No. 34. This float had been drawn out from the slip between Piers 23 and 24, by the New York Central tug No. 18, which at the time of the collision was getting in a position to proceed up and across the Hudson river to Weehawken.

The captain of the No. 18 testifies that a line ran from the bow of No. 34 to the bow of another float, No. 35, and that he brought the floats out of the ship, one after the other, by backing the tug out into the river. When float No. 35 was halfway out of the slip, the force of the ebb tide carried her downstream, and the No. 18, coming around to the lower side, pushed the stern of the float No. 34 up and out in the river. The tug, continuing to shove the No. 34 against the tide, gradually swung around, so that the starboard side of the tug was against the No. 34. In this position her lines were fastened, and then the tug, with the float No. 34, dropped back with the tide along the side of No. 35, while the lines of No. 35 were carried up on No. 34, until the floats were lashed side by side.

Both pilots place the collision at a distance of some 500 feet from the ends of the pier, and at a point almost opposite Pier 23. It is apparent, from an examination of the exhibits, that if the floats dropped back to a point where their sterns were below Pier 23, they must have been withdrawn entirely from the slip, in order to clear the pier, and that if the floats were in the positions represented by the diagrams, tug No. 18 and float No. 34 must previously have been, not only further out in the river, but entirely across the course of the Overbrook

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and her barges, at the time when the tug No. 18 began to fall back with the float No. 34, so as to drop alongside of No. 35. Furthermore, it is apparent from an examination of Exhibit No. 1 that no collision from the effect of the ebb tide could have occurred between the side of the Mamie Aldrich and the port forward corner of car float No. 34, unless the float No. 34 was moving out into and up the river, or was swinging around down the river, as the case may be.

It would be a physical impossibility for the tug No. 18 to get immediately behind the Mamie Aldrich with the No. 34 alongside of the Mamie Aldrich, unless the tug No. 18, with its floats, had overtaken the Aldrich tow, or unless the bow of No. 34 had moved out and down the river after the Aldrich had passed up the river alongside the No. 18. There is no claim that the Aldrich floated back and ran upon the corner of the float No. 34.

There is also a conflict in the testimony, in that the captain of the Overbrook testifies that the two floats had been fastened alongside of each other at the time of collision, and that the No. 18 was proceeding out and up the river, while the captain of the No. 18 testifies that he had not made up his tow.

As the tug No. 18 would seem to have had sufficient power to move the tow up the river, if she had gotten under way with her floats in towing position, and as there would be no logical explanation of such a collision if the No. 18 was ready to proceed ahead while the Aldrich was still overtaking, it would seem that the testimony of the witnesses for the No. 18, that the floats had not yet been fastened together and that the tug was not yet ready to proceed, is the more likely story.

Upon this conflict of fact the case was submitted as essentially involving a question of law. The Overbrook contended that although she was proceeding on a course up the river and toward the New York shore, and although this would place the No. 18 and her tow upon the starboard hand of the Overbrook, no signal was necessary, so long as the Overbrook maintained a course which would allow her to pass safely. The Overbrook further contends that the starboard hand rule does not apply to boats which were not navigating up to the time when, as the Overbrook contends, they suddenly drifted downstream and out into the stream, under the force of the No. 18, in pushing the float No. 34 up against the float No. 35.

The No. 18, on the other hand, which had blown a slip whistle when coming out, but which gave no other navigation signal until an alarm was blown just before the collision, contends that it was not bound to give any signal to the Overbrook and that the Overbrook was the burdened vessel. The No. 18 admits that it had no course in the sense of navigation, but it also denies that it moved out into the river so as to require it to give a navigation signal. It further argues that the Overbrook, which was navigating, must keep away so as to avoid danger from any proper change of position or movement of the No. 18, even though that be not of sufficient extent to require the No. 18 to give notice of what she was doing. Britain S. S. Co. v. J. B. King Transp. Co., 131 Fed. 62, 65 C. C. A. 300.

[2, 3] No case has been cited to show that that rule of navigation, known as the starboard hand rule, does not apply to a boat which is ap-

proaching on a crossing course, and which must pass other boats in motion and affected by the tide, even though they do not seem to be navigating in a definite direction at the time. The effect of the tide itself would give sufficient movement to the No. 18 and her tow to require the Overbrook to keep off, if the course of the Overbrook intersected the path of drift within an area where danger of collision was apparent. If the Overbrook, however, looked upon the tow of the No. 18 as stationary, or already across the Overbrook's course, and if the Overbrook intended to pass as close as possible behind the boats as they drifted with the tide, then the Overbrook did not keep away to a sufficient distance to give safe clearance.

On either theory, she is clearly responsible for at least a share in this collision, and having been brought in by the No. 18, under allegations of fault, decree must go against the Overbrook, unless the No. 18 was also at fault. But, in order to determine whether the tug No. 18 is also responsible in any degree for the collision, we must consider the rule of law applicable to the No. 18, and it will be necessary to determine the exact facts of the No. 18's situation at the time of the accident.

It has already been determined that the collision must have occurred before the No. 18 had both boats in a towing position and had gotten under way. The general weight of testimony supports a finding that the bow of the No. 35 and the stern of the No. 34 had come even with each other, and that the lines fastening the floats at this point had been or were being made fast. An examination of the diagrams and of the testimony of the captain would indicate that at this time he was exerting some force with his engines, so as to send the No. 34 ahead and to force her bodily up the river against the ebb tide. He would thus be closing the gap between the lower ends of the floats and at the same time would prevent further drifting down the river. But in so doing he would be changing from a course under the influence of the tide and of his engines while making up his tow to a course against the tide and substantially across the course of the Overbrook, which at that time must have reached a point where the Aldrich was very close to the corner of the barge No. 34.

[4] If the boats did not move ahead, the tide would then swing the outer and upper end of No. 34 down the river and toward the Aldrich. Hence, instead of continuing upon a course or maintaining a position where the Overbrook could safely pass, the No. 18 undertook to proceed ahead through the water, without giving warning to the Overbrook, and at a time when the No. 18 had no right to assume that the Overbrook was respecting the starboard hand rule, to the extent of keeping entirely out of the way. The No. 18, therefore, was responsible for the effect of her movement and should have continued to drift down the river until the Overbrook had passed, unless there was time to signal to the Overbook as to what the No. 18 intended to do.

This makes it necessary to find that the No. 18 in some way worked ahead further out in the river, or swung downstream, into collision. Even if the Overbrook was mistaken when she saw the No. 18 and

float No. 34 fall back along No. 35, and if the Overbrook thereupon went in too close to the barge No. 34, nevertheless the No. 18 did not respect the situation which she created when she ceased her character of a drifting object, and when she attempted to change her position by the force of her engines, without signaling to the Overbrook, which was then in such close proximity that alarm signals followed almost immediately.

The damages will therefore be divided.